I'm not even going to bother, but I will say, even though this is up here in this court for the third time, we have probably not gone through all 80,000 pages of records, so you need to give us citations where you can. I will also make a comment, although I was never a trial judge like Judge Graves, I did have to retry several cases early in my career, and one judge told me, they're like twice chewed food. So given that, maybe you can stimulate us. First case then is number 1740884, Veasey v. Abbott. We'll hear from Mr. Keller. May it please the court. Senate Bill 5 substantially amended Texas voter ID law by creating a reasonable impediment exception expressly suggested by this court. So whether viewed under mootness, remedial principles, or liability, Texas voter ID law is valid. SB 5 wholly cured any discriminatory effect, and each of the 27 voter witnesses whose testimony underlies plaintiff's entire case can vote without ID or impediment under SB 5. In our opening brief, at pages 20-23, list out each voter with supporting record citations, and plaintiffs have no response to this crucial dispositive point. The district court's findings must be vacated. I'll start with mootness, but whether it's examined under a mootness theory or remedial principles or underlying liability, Senate Bill 5 changed Texas voter ID law in a fundamental way that this court suggested, and the Supreme Court's precedent requires this court to examine the law as it stands now. That's defender-for. There was a substantial legislative amendment that moots plaintiffs' previous challenge against Texas's old voter ID law that did not have any reasonable impediment exception, and plaintiffs' entire theory in this case has been that they were categorically barred from voting for not having ID. That's no longer the case after Senate Bill 5, and plaintiffs have not amended their complaint to challenge the operative Texas law, Senate Bill 5, and the district court conceded that there was no pending claim against Senate Bill 5. So essentially what plaintiffs are now asking for is something akin to an advisory opinion on a law, Senate Bill 14, that will never be in effect again. And to do that, plaintiffs would have to ignore the effect of SB 5. When all 27 voter witnesses whose testimony underlies their claims can now vote without impediment through the seven enumerated reasonable impediment exceptions listed on the declaration, there is no possible ongoing discriminatory effect, although we've preserved our argument that there was no discriminatory effect even from Senate Bill 14, but this panel is bound by the in-bank decision. We acknowledge that. And the idea that plaintiffs could somehow keep this case alive by arguing for a pre-clearance remedy, Vermont agency from the Supreme Court squarely forecloses that argument, and plaintiffs do not cite Vermont agency, they have no response to Vermont agency, and what that case holds is a mere subjective interest in the byproduct of a suit. There, it was a QTAM relator's bounty. Here, it would be the remedy of potential pre-clearance. That does not give right— Didn't Operation PUSH address the issue of mootness in a case like this one? Well, in Operation PUSH, mootness there, the court didn't discuss that, but what the court did say in Operation PUSH was the new law superseded claims against the old law, and so— Well, I'm reading what the court did say, and it said the district court's decision that the 1984 law violated section two of the Voting Rights Act is not moot, because the decision under the 1988 act was the remedy decision going out of the holding under the 1984 act. That's what it said. How is this different? That's right. So, here, we have a substantial amendment that completely changes the nature of the law. This is not a situation where there is a—this court suggested the remedy of a reasonable impediment declaration. And with a substantial amendment to the law, that would moot the case. We also know that from Davis, this court's opinion, recently, where Texas mooted the case by passing a new redistricting map, and that redistricting map had districts that were in the previous map. You're saying Operation—the 1988 law in Operation PUSH, which I reviewed this morning, was not a substantial change? Of course it was. It was a substantial change, but here, not only that, we have the express remedy that this court suggested, that the state—that enacted. So, there is no issue here that there could possibly be any lingering burden, and that also distinguishes the McCrory Fourth Circuit case, because Texas allows regular ballots to be cast under a reasonable impediment exception. That's a key distinction. But whether you're analyzing under mootness, even if it's not moot, there is no basis for any injunction against Senate Bill 5, and the reason for that is because there is no ongoing injury. There is nothing left to be cured, and an injunction has to be tailored to an actual injury. So, here, without any ongoing discriminatory effect, there can be no ongoing constitutional violation. This is in our brief at pages 41 to 42, and our reply at 31 to 32, citing cases like Green, Crawford, and Palmer from the Supreme Court, and Cotton in this court. And I think Cotton and Chen from this court are two very key cases, because what they say is that an amended law supersedes any possible claims about a prior law's intent. That's Davis, as well, and that's also Hayden from the Second Circuit. So, when there is a new law that has been passed, any claims about the intent of the old law fall away, and so whether it's called mootness, or whether it's being examined under remedial principles, this court's precedents and the Supreme Court's precedents say, you look at the law as it stands now, and as it stands now, all 27 voter witnesses can vote without impediment, under just 5 of the 7 enumerated impediments listed in the Reasonable Impediment Exception Declaration that Texas law now has. In addition to the fact that this is distinguishable from McCrory, because we allow regular ballots and not just provisional ballots that can be overridden by ballot boards, Texas law is more lax than the Indiana law that the Supreme Court upheld in Crawford, because the indigency affidavit in Crawford would have required a second trip back to the Circuit Court Clerk's office. Now, this court also suggested that potentially the indigency affidavit could have been a suitable remedy, but that the Texas legislature did is it tracked the interim remedy that had a reasonable impediment exception that both parties agreed to days after this court's in-bank opinion last August. In addition to that, last August, the state informed the District Court that Governor in the next legislative session, Texas legislature meets 5 months every 2 years, and in the immediate legislative session following this court's in-bank opinion, the Texas legislature did exactly that. In February 2017, Senate Bill 5 was introduced. There were 20 of the 31 members that were original authors of that bill, all Republican members of the Texas Senate. That passed the Senate in March 2017. Both the United States and the state of Texas asked the District Court to abide by this court's precedent and the Supreme Court's precedent and give the legislature the first reasonable opportunity to fix the law. The District Court responded saying it was not going to wait and would issue an opinion on discriminatory purpose that, quote, it's early as convenience, unquote. That violates this court's mandate. It violates this court's precedents, the Supreme Court's precedents. And if the District Court had waited, as Senate Bill 5 would have been on the books long before any discriminatory purpose finding, regardless, we asked for reconsideration after Senate Bill 5 was passed and the District Court refused to reconsider. But this court's mandate expressly directed the District Court to take account of any interim legislative action. And when you have Senate Bill 5 passed, that completely eliminates any injury from all the plaintiffs and all of the testimony shown in the record. That is a substantial amendment that would have changed the nature of that claim. And when this court directs the District Court to examine that legislative action and the So then would it be appropriate to vacate and remain to the District Court for full consideration and evaluation of SB 5? That would be one of our back-up to a back-up to back-up arguments. And the reason for that, though, is this court had already did that. What this court said... Back-up to a back-up to a back-up. That's right. We have various back-up arguments. I appreciate your willingness to back-up, though. Well, that would be a proper remedy. However, you'd have to get, first of all, you'd have to find the case is not moved. You'd have to find that somehow the injunction would have possibly been proper in a different set of circumstances. And here, this court has already remanded for that. What the court said was it remanded because it needed to, quote, be confident of the evidentiary record and the adequacy of the lower court's consideration of it. That's 830 F. 3272. But here, the District Court issued a 9-1-1. Well, that remand was for the consideration of whether or not there was a discriminatory intent. Is that right? That's right. But what the court directed the District Court to do was to re-examine anew the totality of the evidence. And the District Court responded with a 9-1-1 page opinion that doesn't cite the record. We put 334 pages of briefing before the District Court at the District Court's request on remand. And what the court has before it today is the product of that. And so— What was the difference in your briefing on remand from the way the—this evidence had been considered the first time around? Well, first of all, we had much lengthier briefing. But again, there has been no forfeiture of any argument, as plaintiffs have said. Well, I'm not saying that. I'm just saying, just describe to me, were you taking each of the Arlington factors and, you know, re-lining them up against the evidence in the record, or what? Yes, among many other things. Getting into the factors of the purpose finding here, take the unnatural speed finding, Senate Bill 5 somehow was—or Senate Bill 14 was somehow passed with unnatural speed. That is clearly wrong. It took the entire legislative session from January to May 2011. In addition to that, the Texas Legislature, for six years, had been actively debating voter ID legislation. Opponents had conceded that they were ready to offer amendments. They conceded they were picking up from the 2009 discussion. There were over 1,500 transcript pages that were produced of the legislative record in Senate Bill 14 in 2011 alone. That's in our brief at page 62. Senate Bill 14 was debated for nearly 36 hours. The Senate adopted nine amendments. The House adopted 15 amendments. This is completely different from a situation such as McCrory and the Fourth Circuit, where you have consideration of that bill over the course of nearly three weeks. And here, this was part and parcel of a 4,500-page transcript legislative record over six years. In addition to that, the district court didn't consider all sorts of proponents' favorable statements. The district court said it only examined plaintiff's probative evidence. This is ROA 69773. When the district court's only examining plaintiff's evidence, and not the totality of the evidence, and all sorts of treasure trove that the plaintiffs actually obtained of proponent testimony, of legislatively privileged testimony, that supported the state's argument, that alone is another basis of error. Even SB 14 opponents said there was no invidious purpose from the proponents. This is ROA 38511, 38996, and 46416. In addition to that, the legislature expressly relied on polls that showed that photo voter ID laws were widely supported across both racial and political lines. And while the district court said that maybe those polls weren't formulated the best to get constituent responses, legislators expressly relied on those statements. And when you're analyzing the legislature's purpose, that evidence is very probative, particularly against the backdrop of a presumption of constitutionality, good faith, and regularity that must be honored when doing the hard work of analyzing a collective body's intent. That's why the Supreme Court said that courts must use extraordinary caution when they're approaching claims like this. The legislature had multiple purposes for passing the law? Yes. And it's completely valid. It wanted to deter voter fraud, and it wanted to safeguard voter confidence. But to be clear, the legislature... It was just those two things? It would have been deterring voter fraud, safeguarding voter confidence. It would have been election integrity. But it would not have been trying to prevent people from voting. It would not have been preventing people from voting. And what, again, was the evidence of voter fraud? The evidence of voter fraud, there was actually evidence that there were four prosecutions for in-person voter fraud in Texas over the past 10 years, as Plaintiff's expert said. And that is a stronger record. Four? There were four. There were four documented prosecutions. How many votes were cast in Texas over the past 10 years? There have been millions of votes cast. But crucially... 10 million? 20 million? Millions. But when we're talking about in-person voter fraud, and the Carter-Baker Commission also said this, is it's very hard to detect. And without ID laws, it is hard for states to detect that. And that's why even the Carter-Baker Commission here said, when you have an exception such as a reasonable impediment exception, having perjury penalties attached to that is wholly valid and necessary to safeguard election integrity. And Plaintiffs now say, without pleading any claims against Senate Bill 5, that the perjury penalties that would attach to the reasonable impediment declaration are somehow discriminatory. But those were part of the interim remedy. If you file a false voter registration statement in the first place, aren't you subject to criminal penalties? Yes. In fact, higher penalties even under federal law. Under federal law, yes. That's right. And so that theory would sweep away all sorts of election law. That is not a theory just about Texas's photo voter ID law. But if I could... Counselor, the notion that your legislation is responding to voter fraud is a bit difficult to swallow. At best, they're dealing with partisan politics. I mean, I find that really difficult. We had four cases of fraud out of tens of millions of votes cast. So what all that means, what all that takes you to, is that it's largely a partisan effort to enhance their position, not a stranger to, we said, redistricting in their return for both the right and the left. That still leaves us then with a simple fact that we have a freestanding bill now. And the relief you seek, I take it, the future course will be that there will be a challenge to that next legislation. Is that the way you see it unfolding? Yes. If places would like to challenge Texas voter ID laws, they can bring in lawsuits and challenge that. But they would have to mark the record evidence that that is showing. And they don't have that. All right. So you have time for rebuttal? Yes. Thank you. Mr. Gore? May it please the Court. John Gore on behalf of the United States. The Texas legislature accepted the online court's invitation and adopted a legislative remedy that directly and completely cures the harms and infirmities that the court found in SB14. In fact, the legislative remedy largely tracks the interim remedy that the district court entered for the 2016 election. And it remains undisputed that the interim remedy completely cured the discriminatory effect that the court found in SB14. This case began as a challenge to Texas's old voter ID law. So this is a lawsuit really, this lawsuit is being driven by 3C? That's absolutely right, Your Honor. And SB5, by eliminating the discriminatory effect the court found in SB14, removes any basis for any further remedy in this case, including Section 3C relief. SB5, the lawsuit began as a challenge to SB14. And what the court found was that SB14 had a disproportionate racial impact on the subset of Texas voters who lack a photo ID and cannot reasonably obtain one due to one of five impediments that the plaintiff voters and other voters testified to at trial. Those impediments were lack of transportation, lack of underlying documentation, work schedule, disability, and lost or stolen identification. SB5, the new voter ID law in Texas, maps on to all five of those impediments. It completely excuses the voter ID law and the voter ID requirement for any voter who faces any one of those five impediments. So that alone is enough to establish that SB5 cures the harm that the court identified in SB14. There's no need for the court to go any further than that. But the Texas legislature did. It identified a few more impediments and added them to the list. Those include family responsibility, ID applied for and not yet received, and they even added illness to the disability category. So as it stands today, under SB5- Did it eliminate a category? No, it did not. Was there an other category or something like that? Sure. The other line was part of the interim remedy, but it wasn't necessary to cure the harm that this court identified in SB14. And interestingly, Your Honor, even the district court never said- But that wasn't eliminated. It was eliminated from the interim remedy to SB5, but the interim remedy was broader than necessary to cure the defects the court had identified in SB14. And the other line wasn't necessary to cure any defect or infirmity or harm flowing from SB14. The district court also never said that it was. I've laid out the five impediments that were in the record, and all five of those impediments are now covered by SB5. The other line was added through negotiations of the parties because that line appears in these reasonable impediment procedures in other states. But there was no finding in the record, and the district court didn't make one on remand, that the other line was necessary to cure any harm. The district court said something else entirely. The district court said that it thought that removal of the other line was a, quote, harsh response to abuse of that line under the interim remedy that, in the court's view, didn't actually advance Texas's interest in secure elections. But those are all policy judgments. Those are judgments for the legislature to make. Those aren't legal or remedial judgments for a district court to make. And they have nothing to do with whether SB5 cures the harm in SB14, and the record on that claim is clear. As counsel just laid out, there were 27 voters who testified at trial to these five impediments. Did this court say anything different on remand of this case than we said in Operation PUSH vis-a-vis evaluating the amended law? We certainly agree that on that point, Operation PUSH is controlling and shows the court exactly what it ought to do in terms of analyzing the amended law. And my point there is that Operation PUSH said that you had to look at the new law in terms of whether it met the constitutional and statutory requirements, which the district court here declined to do. That's absolutely right, Your Honor. And the private plaintiffs never challenged the new law under the Constitution or under Section 2. They haven't even alleged that SB5 was enacted with a discriminatory purpose, and they haven't even tried to put in evidence on that, even though the district court offered them the opportunity to do so. And the rules of civil procedure would have allowed them to amend their complaint to do so if they had wanted to. So they've given up on that claim, and they said in the record... So for you, the same question I asked Texas, why wouldn't it be appropriate then to vacate and remand for the district court to fully consider the effects of SB5? Well, on the effects question, Your Honor, SB5 is already clear on its face that it cures the discriminatory effects in SB14 because it covers all five of the impediments that were testified to at trial. And the private plaintiffs never dispute that. They don't dispute that it covers all five of the impediments that are in the record. They don't dispute that every voter who testified at trial that they couldn't vote under SB14 now can vote under SB5. Now, their argument... Excuse me. That was a little repetitive. Their argument, however, about remedy is that because the court found discriminatory purpose, that the burden shifted to the state to prove that there was no change of discrimination in SB5. And they referred to a bunch of cases from the 1960s on that subject about fully curing the debate. What's your answer to that argument? So two responses on that, Your Honor. First, we think Operation Push is controlling the more recent case. And second of all, we've distinguished those cases in our brief. They cited, for example, the Green case, which was the desegregation case, where the Supreme Court and the federal courts at first deferred to the legislative remedy for about three years and only when it became obvious that the legislative remedy wasn't fixing the problem did they bring the state back into court and require it to bear the burden at that point. Let me ask you. Is Swann v. Charlotte Mecklenburg a discriminatory purpose or effect case? I believe it's a purpose case. I thought so, too. And the Supreme Court in that case said that the remedy can't go farther than the violation. That is Hornbook Article III law, Your Honor, and we completely agree with that. And that's why we have come out on the position in favor of SB 5, because SB 5 fixes the violation. It fixes not only the results violation, it fixes the purpose violation as well, because it eliminates the discriminatory effect. Now, the private plaintiffs have mischaracterized the position of the United States on page 86 of their brief. They say that we somehow conceded that they're entitled to broader relief on the purpose claim. We've never made that concession. They cite pages 35 and 36 of our brief, which I've now reread several times, and there's no concession to that effect in there or anywhere else in our brief. Starting on page 23 of our brief, we've explained that SB 5's elimination of the discriminatory effect also eliminates the discriminatory purpose claim and any remedies based on that claim. And it's easy to understand why. The first Arlington Heights factor is whether there's a discriminatory effect, whether there's a disproportionate burden on one group or another. And so if you've eliminated the effect, you've eliminated the discriminatory purpose violation. So again, SB 5 eliminates relief on the effects claim, it eliminates relief on the purpose claim, and it takes care of all the problems that the court identified, and it goes even farther because it adds more impediments to the list that excuse the photo ID requirement. Texas's reasonable impediment exception is now broader than those that have been upheld in other states. Unlike Indiana and South Carolina, it allows voters to vote a regular ballot at the polls on election day. It's not a provisional ballot, it's not a ballot that's subject to challenge by other voters, and it's not a ballot that they need to go back after a few days, travel back to a county registrar's office and provide additional documentation. That's what you have to do in Indiana and South Carolina respectively, but Texas has removed that here. That was a major improvement from the perspective of the United States. It's one that we insisted on in the interim remedy. It's one that was carried over and preserved in SB 5. The private plaintiffs had their opportunity to challenge SB 5, and they decided not to do so. So we think that it's clear, regardless of the legal rubric the court uses, we think all roads lead to Rome in this case. What do you say about the court's focus on the fact that she suggested there was inadequate provision for educating public and what is it, mobile EIC units? We disagree with the court on that point, Your Honor. We think that Texas has made a strong public commitment that covers all the issues on that front. They are in the process of providing written notice to every active registered voter in Texas. The voter ID rules are going to be printed on the voter registration certificates that are replaced free of charge whenever requested. They've committed to spending $4 million on public education and awareness. That's more than the $2.5 million they allocated for the 2016 election. They've also committed to training their election workers. Was all that before the district court? Absolutely. It was before the district court. In fact, the parties had- You didn't even refer to the business about notifying every voter in their voter registration card, right? That's correct, Your Honor. That's absolutely right, Your Honor. Just like the court also didn't refer to the fact that SB 5 covers the five impediments that the 27 voters and witnesses testified to in the district court. And that, to us, is the dispositive point. SB 5 is an adequate remedy. There should be no further remedy on any claim and certainly no Section 3C relief in this case. So we ask this court to reverse. All right. Thank you. I understand Mr. Rosenberg is first. Yes. May it please the court, Ezra Rosenberg from the Lawyers' Committee for Civil Rights Under Law, representing the Texas State Conference of NAACP branches and the Mexican-American Legislative Caucus. I will be the first of three advocates on behalf of the private plaintiffs to address the court this morning. In order to, we hope, avoid redundancies and facilitate the discussion here, we've divided the argument in this way. I will first argue and explain why the district court's finding of discriminatory intent should be affirmed under Rule 52. Ms. Nelson will then explain why Texas's mootness argument should be rejected. And Mr. Dunn will conclude by demonstrating that the district court's remedial order was well within its discretion. In terms of the discriminatory intent finding, I would focus on two issues. The first is that contrary to Texas's position, the district court, in fact, did do precisely what was anticipated by this court, by the en banc court. The en banc court specifically stated, after finding that there had been some infirmities in the district court's initial analysis of discriminatory intent, stated that because we do not know how much the evidence found infirm weighed in the district court's calculus, we cannot simply affirm the decision. This is on page 741 of the court's opinion. Instead, the court said, recognizing that it was within the exclusive province of the district court to decide how the infirm evidence had weighed in this decision, it was remanding that decision to the district court for that reason. It did not tell the district court to start from scratch. It did not tell the district court that it had to review each and every subsidiary finding, even if those findings were untouched by any infirm evidence. In essence, the issue was, did the infirm evidence tip the scales? So what does it mean when the court says, we remand to the district court to, quote, reexamine the probative evidence underlying the discriminatory purpose claims weighed against the contrary evidence in accordance with appropriate legal standards? Then the court says, we instruct the court to take the requisite time to re-evaluate the evidence and determine anew whether the legislature acted with discriminatory intent, and then, I believe it's stated yet again in the remand, what does re-examine anew, what does it mean to take into consideration the contrary evidence? And then all she does is, okay, the court took out the history of past discrimination, the court took out statements of opponents, the court took out, I forget what the other point was, of the Waller County deal, but everything else supports my finding, and that's the end of it, end of story. Well, I don't think it's the end of the story, Your Honor. Well, that's the end of what she wrote. I think that, in fact, Judge Ramos followed the court's instructions, because the court instructed Judge Ramos to review anew the evidence, and by anew it meant in the context of two things, not just the prohibition against relying on infirm evidence, but there were other rulings made by the en banc panel that also guided the court. There were at least 12 findings, 12 rulings by the en banc panel, finding that specific subsidiary factual inferences drawn by the district court were based on record evidence, were legally relevant to the ultimate issue of discriminatory intent, and taken together were sufficient to support an ultimate conclusion of discriminatory intent. I certainly give you credit for that point, but when you talk about examining anew, you know, the majority in the en banc did say that we don't require direct evidence of discrimination because motives like that can be hidden, but the district court had access to thousands of pages of internal legislative decision-making memoranda and comments and e-mails and so on, thousands of pages, and nobody, I mean, maybe you can cite things, but if there is nothing that says we are trying to advantage white voters over all other voters, isn't that proof that there's no discriminatory intent? That may be, may be, something from which an adverse inference might be drawn, but as this en banc panel stated over and over again, the job of drawing adverse inferences is for example the e-mails. As was also submitted to the trial court, there was an automatic deletion policy by the legislature which severely hampered the number of e-mails, even assuming that contrary to what the Fifth Circuit also stated, it would be unexpected to find a statement of admission as to discrimination. The only e-mails that we had from Lieutenant Dewhurst were zero. From Senator Frazier, who was a sponsor of SB 14, we got two e-mails, and from, one or two, I'm not sure which, I think it's one, and from Representative Harless who was the House sponsor, two e-mails. So they, yes sir, but they were all, they all testified under oath, under deposition for about seven hours or many hours per person, and are you suggesting they were hiding their motives? No, I'm suggesting that, for example, the deposition of Representative Harless, which I in fact took, she was not able to explain any, virtually any of the material decisions that went into the passage of SB 14. She couldn't, she couldn't testify as to whether or not she believed that there was in fact in-person fraud. She couldn't explain why in the same legislative session she had submitted a bill that had... So what, but if she didn't say anything that leads one even to imply that she had a racially biased motive, I mean, how can you sustain a, and she's one legislator, and you can't just rely on an individual legislator, as Operation PUSH points out. You have, you have thousands of pages, not one stray word reflecting racial bias appears, and the district court didn't even take that into consideration. Well, as the en banc panel stated, that is not unexpected, and in fact, what the en banc panel also did was... I'm sorry, Your Honor. No, sorry. What the en banc panel also did was set forth a series of subsidiary findings which it found legally relevant. This included awareness of possible, of potential discriminatory impact. It included the pretext and tenuousness of the reasons given for SB 14. It included the specific choices made by the, by the legislature that were the rejection of ameliorative amendments. May I ask you one other question, and that is Mr. Gorse pointed out that the first Arlington Heights factor is discriminatory effect, and where the legislature has cured discriminatory effect, and this may go on to the other deal, but if the legislature took into account discriminatory effect in changing the law, doesn't that undermine any possibility of discriminatory purpose in SB 5? Absolutely not, Your Honor, and that will be addressed by the other advocates, but what happened in SB 5, and we of course do not believe it did cure either discriminatory effects or discriminatory intent, but that is a remedial response to findings of discriminatory effect and findings of discriminatory intent, and that does not retroactively change what the intent was back in 2011. There is case law to that effect, Hunter... Did you take any position on SB 5 in the district court, sir? I'm sorry, Your Honor? Did you take a position with regard to SB 5 in the district court? Sure, we took the position that it was not a cure of the, of the findings... Challenge. We... You didn't offer any new evidence, is that what you're saying? As part of the remedial proceedings before Judge Ramos, we took the position that SB 5 did not cure the discriminatory effect or the discriminatory intent findings. What's missing from it? What's missing? What's missing are, first of all, when you're dealing with discriminatory intent, what's missing is placing the plaintiffs back in the position they would have been were it not for the discriminatory intent, and in terms of the discriminatory effects, as we'll be going into by Mr. Dunn, it includes the getting rid of the other box, and the main thing, putting people into a second line, people who are the victims of discrimination... I thought they responded to every complaint that was made in your initial, in the challenge to the legislation to begin with. I'm sorry, Your Honor? I thought that the legislature responded to every one of the particular, each of those complaints that were made before. Well, Your Honor, as my time's up, it's Mr. Dunn, and Mr. Nelson will get into... You can ask the question. In fact, it did not. It did not cure the effects, and it did not place the victims of the discrimination back in the position they would have been had it not been for SB 14. One final question, if I might. Does that mean that you really were going to get more relief than you were asking for in your original litigation, the challenges that were made? No. What we're saying is that the legislative attempt to remedy the judicial findings of discriminatory effect and discriminatory... Allowed the court to go further than those matters that were complained of? No. I think that that's in line with Operation PUSH, where the court could review what was  Thank you, Your Honor. All right, sir. Ms. Nelson? Good morning, and may it please the Court, I am Janae Nelson of the NAACP Legal Defense Fund. On behalf of private appellees and private appellees' intervenors, I'll be discussing the matter of mootness, and as my colleague said, Mr. Dunn will follow on remedies. The State places a lot of stock in the argument that SB 5 moots this case, and that investment is significant, so I can go into them very briefly. First, contrary to what Mr. Keller says, SB 5 does not substantially change or wholly cure SB 14. Rather, SB 5 carries forward the most discriminatory provisions of SB 14, and it adds a new express threat of criminal prosecution by state felony, state jail felony, which carries with it a penalty of a minimum of six months in jail plus... How does that differ from the federal rules? It differs from the federal rules in that the federal rules do not require that on the very remedial instrument, the Declaration of Reasonable Impediment that SB 5 creates, that there is a warning to prospective voters that they will be subject to criminal prosecution. And that, we believe, has a chilling effect, and frankly, as the district court says, it takes back the very remedy that the state has provided, with what one hand gives, the other takes away. So our concern is that SB 5... Let me ask you a question. If you vote with a fake driver's license as your ID, you could go to jail too, right? That's correct. Is the penalty any different for filing an intentionally false statement why you don't have IDs than it is for if you vote with a fake ID? I'll tell you what the difference is, and this goes to my second point as to why SB 5 does not in any way cure SB 14's discriminatory effect or intent, and that is it creates two separate processes. It creates a two-tier voting system in which you can vote with a fake driver's license, or you can vote with a fake ID. But they can go to jail too if they present a fake driver's license, right? They can go to jail, but they do not have to vote under the express threat of criminal penalty and prosecution by having that on a voter form that is intended to be a remedy for intentional discrimination and discriminatory results. Your complaint is that there's a warning that there's a felony, not the existence of a felony. So the warning is required by SB 5 to be on the declaration of reasonable impediment, to say that if in fact you choose the wrong box and you misstate something on this form, you are subject to a state jail felony. And that is, I think everyone can agree, a deterrent to voters who may choose the wrong box, who may be nervous about whether they, by choosing this remedy, are exposing themselves to serious criminal prosecution. Whenever you sign an application at a bank, you're warned about Rule 1001 making false statements. And as we all know as lawyers, nobody says that's racially discriminatory because certain people think they need, you know, make an accidentally wrong statement and go to jail. I mean, that's, it's just not common sense. Well, but looking at that particular instrument in isolation, SB 5 is intended to be a remedy for intentional discrimination and discriminatory effects. And what is the violation here? The violation is that SB 5 carries over the very discriminatory feature that made up 314 intentionally. So the violation in question is that people were not able to vote. They were not able to vote. At least that's what the claim was. They were not able to vote. It wasn't that we have one registration system for minorities and another registration system for non-minorities. It was the same facially neutral system, and certain people were not able to vote. So that's the violation. So if the cure enables people to vote, then how can you say there's lingering effects? The violation, as plaintiffs put forth in paragraph 58 of its complaint, is that Black and Latino voters did not have an equal opportunity to participate in the voting process. That includes the inability to vote. That includes the abridgment of the right to vote. And that includes a process like SB 5, which creates a two-tiered system in which Black and Latino voters are literally required to vote on separate lines if they do not possess one of this narrow set of voter IDs and therefore have to vote in a separate line with a separate document. And that creates an unequal system that the Voting Rights Act and the Constitution cannot countenance. The other reason that SB 5 did not fully cure SB 14 is that even assuming arguendo, that SB 5 disadvantages... Before you lay that, so the relief that you would seek to correct that, what you argue here is a practice that's inhibiting minority voting, and you would simply, how would you respond to that? You would simply take it off the table. There would be no advice of any kind. No warning. Say nothing about it. In terms of the criminal penalty... Yes, yes, yes, yes. The interim remedies include the very common disclaimer that you are signing this affidavit under penalty of perjury. What it does not do is set out the very statutory code and says that this is a state jail felony, which is required under SB 5. I'm asking you, and that's to say you prevail on it, then you ask the judge, the district judge, I'm going to ask you, counsel, what do you want? What do you want this to say? What is the relief, what is the precise relief you want? Thank you very much for that question. The precise relief we want is a new law that does not carry forward the very narrow set of IDs that excludes, as a preliminary matter... I'm focused really on the narrow point of advice and warnings about criminal penalties. Do you want those just off the table? I'll mention that, but what do you want? I think the threatening language should not be included in the reasonable impediment affidavit, and certainly it can include some language that indicates that they are signing under penalty of perjury, but the detailed language that SB 5 requires that, as I mentioned, imposes a very stringent felony and heightens the felony consequences from what it was prior to SB 5. You say it's okay to tell people that this is under penalties of perjury, but it's impermissible to say that you get the jail time to go with it? I'm saying that if we recognize that this was intended to remedy the intentional discrimination and the discrimination that resulted from the effects of the narrow set of IDs, that this court agrees was conceived based on tenuous reasons, and that the district court found was based on tenuous reasons at best or intentional discrimination at worst, if we are trying to cure that, then to include an express threat of criminal prosecution in the remedy takes away the very remedy that we have sought and achieved in this case. I saw an implicit in mind that the district judge originally found that one of the indicia of racial segregation, I mean discrimination here, was the presence of this warning. The district court expressly found that in finding intentional discrimination that the presence of that warning was evidence of intentional discrimination? If I understood you correctly, the district court judge did not find that the presence of that warning was evidence of intentional discrimination. What the district court found was that that warning undercut and undermined the very remedy for the intentional discrimination and the discriminatory effects of SB 14. If I may answer the very last reasons why SB 5 does not fully cure SB 14. I'm not talking about the remedial portion at the moment. I'm talking about when the original findings of the district court were re-instituted, was the inclusion of that particular provision regarding the warning an evidence, an inference, what's an inference of racial discrimination? Purposeful discrimination? If your question is whether the inclusion of the criminal penalty... What did the district court do with regard to this particular provision and her original findings that this was intentional discrimination? This was not part of her original finding on intentional discrimination. There's a wealth of other evidence to support... You only found this in saying that, well, there is an independent somewhere out there intentional discrimination and it's part of that remedial relief. We want to take out these particular notices. What I'm suggesting to you is that you're asking for remedial relief that at least facially is more broadly than the original claim injury to you. That's the implication of it. I want to understand what you're saying. The relief that we are seeking is not broader than what we originally asked for. What Judge Ramos' exercise was below is to see, as this court did in Operation PUSH, whether SB 5 is an adequate remedy for the intentional discrimination and the disparate effects of SB 14. In evaluating SB 5, Judge Ramos noticed that the remedy provision was fully undermined by this criminal threat of prosecution. In addition, it did not address... It was deafeningly silent on the matter of educating voters and requiring the necessary training. And most importantly, it carried forward the most discriminatory feature of SB 14. And for those reasons... Yes, thank you. What do you say about the fact that if they're mailing out with every voter registration card... And this doesn't change the law on voter registration cards. If every voter registration card is referring to the availability, the way in which you can vote with a reasonable impediment, which is what I understood Mr. Gore to be saying, why doesn't that inform voters? Are you presuming they can't read? Not at all. I believe that... Well, then why didn't Judge Ramos mention that? Well, it was not part of SB 5. It's one thing for Texas to make the representation... They're saying it is... But it wasn't part of SB 5. But if she thought they were lying? I'm not suggesting that. What I'm suggesting is that there's nothing that requires Texas by statute to provide the representation. And the district judge should have taken that into account in evaluating whether SB 5 would cure it. Certainly those representations are helpful. But this en banc court found that SB 14 is the most strict and probably the worst implemented law in this country. And nothing in SB 5 addresses that fact. I have no remaining time. Counsel, you mounted your full throated opposition to SB 5 in the district court. Every complaint you had about SB 5, you raised already below. And all we need do is read SB 5, juxtapose that against the record and the district court's findings, and determine that you should prevail. That's all we need to do. It depends on what the undertaking is. If we are looking at whether SB 5 is an adequate remedy to SB 14, yes, we've mounted all of our defenses. If we are looking to whether SB 5 independently was enacted with discriminatory intent, then that would require a remand and additional evidence which we believe we can muster. Why can't you make all these arguments in an independent suit which attacks the extent law? I'm sorry. Why can't you make all these arguments in attacking the legislation? Or can you? We can make those arguments, but that is not what we are required to do. It's the state who bears the burden of proving that SB 5 is an adequate remedy for SB 14. And it has failed at meeting that burden. Well, that's all theoretical and hypothetical, isn't it? I mean, insofar as there was no additional evidence and you didn't bring any I feel threatened or I can't vote because I have yet another objection. You know, it's all speculative. Judge Jones, I don't think it's hypothetical at all. I believe that if you look at the face of SB 5, if you look at the text of SB 5, it nearly verbatim carries forth the very discriminatory feature of SB 14. We don't need additional evidence to prove that. If you look at the text of SB 5. So basically what you're saying is you mounted every objection to SB 5 and your bottom line is there can be no voter ID law. Right? Not at all. I think the Supreme Court has established that voter ID laws are perfectly consistent. Well, that's wonderful because then, okay, so there can be a voter ID law and your side did agree to these various provisions in the voter ID law on remand and while you are not bound by those, I can't, it's hard to believe that your side would have agreed to the reasonable impediment affidavit with a criminal penalty allowing people over 70 not to have to do that and so on and disabled people and yet now somehow that's not enough. Well, SB 5 does not mirror the interim relief identically and we've identified already the differences that are actually quite significant. One is, as I mentioned, having this very expressed language on the declaration of reasonable impediment, the threat of a state jail felony. Second, this SB 5 has removed the other category, which is an option that allows voters to explain precisely why they believe they do not have the ability to possess one of the strict forms of ID. That's incredibly important if you pair that with the threat of criminal prosecution. Is that incredibly important when you consider the fact that there were about as many uses of other as there were of allegations of fraudulent in-person voting, which is to say three dozen? Well, I think, interestingly... Right? I mean, wasn't that the evidence that only a few dozen people had availed themselves of other? If we look at what people... Is that correct? Answer, please. That only a few people? I don't know the precise number. Well, there was all this post hoc evidence put in about it, and it would amount to a few dozen. But anyway, I'm taking... If you want to make one concluding sentence, please. Sure. I take an advantage of your eloquence. Well, thank you. I appreciate that, Judge Jones. You have to talk fast enough to be able to... I will talk very, very fast and just say that, you know, as the Supreme Court noted, it is no small matter to deprive the litigant of the absoluteness would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought. Clearly, the plaintiffs in this case continue to need judicial protection. We ask that this court affirm the findings of the district court and continue, as every federal court that has heard this case has, to protect the right to vote of all Texans unfailingly and laudably. Thank you. May it please the Court. My name is Chad Dunn, and in my time before the Court, I want to address this issue of remedy. Judge Higginbotham, you've been asking whether it is that plaintiffs are seeking more relief than they're entitled to. Let me be clear. My concern is directed toward moodiness. I understand, Judge. And, in fact, that's exactly what I want to hone in on is the remedy issue. The plaintiffs in this case in the district court were governed by U.S. Supreme Court decisions. We're not writing from a clean slate here. And, in fact, it's clear in one case after another, I'm prepared to talk about each and every one of them, that where the Supreme Court says that you have to put plaintiffs back in their original position, that is the relief we need. In other words, Ms. Nelson said it's okay to have a photo voter ID requirement, but you're saying it's not. Sure. And I'll tell you what else is not acceptable. What is sure? You're saying it's not, aren't you? It is acceptable to have a voter ID law. What's not acceptable is for us here in this court or in the district court to lay out the parameters of it. The Supreme Court says the legislature has to be given the opportunity to craft the bill not using a discriminatory purpose and completely eliminating the discriminatory effect of its earlier effort. And that's exactly what the district court did. If the district court had sat down and crafted our own voter ID law, we'd hear from the state and the United States, presumably, today that the district court stepped outside the boundaries and set itself in the place of a legislature. That wasn't her job. That's not what she did, is it? It is not what she did. Instead, what she did is she followed... No, I put that... I mean, isn't that precisely what she did? She did not. In fact, what she did was she enjoined the law on the basis of discriminatory intent, and she told the legislature it's your job in the first instance to fix the discriminatory intent. I mean, yeah, but on the case that we're hearing today, she enjoined any voter ID law, right? Photo voter ID law. Because Hunter v. Underwood, because U.S. v. Virginia, because City of Richardson v. U.S., these Supreme Court cases all required her to do that. And I start on the Senate bill... Require that? Now that's not right, Mr. Dunn, so you need to explain that. The City of Richmond v. U.S. says that a law enacted with a discriminatory intent has no legitimacy at all. And this Green v. the County School Board says it must be eliminated root and branch. U.S. v. Virginia, Chief Justice Rehnquist's opinion from 1996 says that the plaintiff's got to be put back into, quote, the position they would have occupied absent discrimination so far as possible. And what's the position they would have occupied absent discrimination, leaving aside the fact that 96.5% of all Texans of every race possess these IDs? Well, they wouldn't be sorted into a preferred and non-preferred class like they are now. What's non-preferred about going to the poll on Election Day without a voter ID but with the reasonable excuses that are provided in SB 5? The en banc court and the District Court opinion both said that there was no explanation for the particular IDs Texas chose to use in its bill. And that didn't change. It didn't change under Senate Bill 5. And the fact that there was an intentional racial disparity between the ID possession exists right now. But our court did not say, it said there might be a broader remedy, but it certainly didn't get into what the nature of the remedy might be. Well, that point I don't have to agree with, but U.S. Supreme Court decisions nevertheless say if there is a finding of intent, the entire law is struck down. Lawn v. Charlotte-Maxwell buried a purpose case? It was a purpose case and a segregated schools case. Right, and most of these others had nothing to do, none of these others that you're referring to were voting cases, but... Well, the city of Richmond v. U.S. was a voting annexation case. That was annexation, right. Yes. If you take the Oklahoma voter registration... And there was only one purpose for that. I mean, that's a very grotesque case. This is a case where 96.5% of all Texans of all races have their IDs, so it's not the same level of discrimination. Well, Judge Jones, on that point, I guess, you know, I appear in front of this court a lot, in front of Your Honor a lot, I have a tremendous amount of respect, but on that point, the en banc court decided this, and no one could have... All we decided was to remand discriminatory purpose. Well, under the Pullman standard, if there wasn't sufficient evidence of discriminatory purpose, this court en banc was obligated to reverse and remedy. Well, I understand that, but then, and you're going to talk about remedy, I'm not trying to revive the purpose business, but I am suggesting that, A, we have Operation Push, but, B, the remedy is supposed to be tailored to a violation. In this case, an intent violation, which is why all these Supreme Court cases say the entire law is enjoined and the legislature is given a chance to remedy it. And let me point out on the Senate Bill 5 failures. Here are the things that this court said en banc was the problem with Senate Bill 14 that Senate Bill 5 doesn't fix. One of them is the picking and choosing the have and have-nots of IDs. The rate of possession of the IDs selected were disproportionately held by Anglos and others in the population, and there was no rational basis for it, no rhyme or reason. For example, the Department of Public Safety issued scores of IDs. This is at ROA 27169, issued scores of IDs, but the only ones the state chose are ones that are disproportionately held by whites, the state ID and the driver's license number. This picking and choosing of have and have-nots in voting exists under Senate Bill 5, so that's number one. The second thing the en banc court found, as did the district court, is that there were obstacles to obtain these IDs. Nothing's done about that under Senate Bill 5. The third thing the en banc court and the district court found is that there was no funding for implementation, that the state claimed to have found a couple of million dollars that wasn't appropriated and did an incredibly poor job of telling the public how the ID process was going to work. And guess what? Senate Bill 5 also appropriates no money. We have some unsworn statement and briefing that the state's going to find a few million dollars to inform. How often does the legislature normally appropriate money for everything in the same bill in which it sets out new standards? Well, in Texas there's a separate appropriations bill, but the district court had it available and knew that there was no individual appropriation. That's not disputed here. And, in fact, what had to happen was the litigants, the state, had to file a briefing. But the state's lying when it says they're going to spend $4 million. The state may or may not spend $4 million. Our point, which the district court and the en banc found, is that $4 million, even if it is spent, is incredibly insufficient to inform a state of this size and this capacity. Well, since you're talking about only a couple hundred thousand voters, as I recall it from the first case, who were potential minority voters who were disenfranchised, $4 million, you could mail each one of them certified, you know, along with a couple dollar bills and cure their problem. Six hundred and eight thousand registered voters and 1.2 million eligible voters. That's at ROA 2707. Yeah, but 608,000 was everybody, was it not? But 608,000 are people that lack the possession of a San Diego Fortuny group member. The minority, ma'am? The number of minorities? The number of, no, that's the total. Yeah, I just don't remember. But anyway, I'm not quibbling with you, but I am saying that even if you were talking about a million dollars, a million people who were allegedly disenfranchised by SB 14 or SB 5, $4 million is a lot of money to throw at that. Well, ultimately, I guess that would be up to the district court to decide. This case is governed by the en banc decision, Rule 52, and on-point U.S. Supreme Court decisions that say what the remedy ought to be and an intent case. And to some degree, we're sort of debating the original merits of this case today. This case is not complicated at this point. Well, do you guys want to write the law? Ultimately, it's the legislature's job to write the law. And if they were interested, in my opinion, which is probably unlikely at this point, but if they were interested, in my opinion, of what ought to be in the law, it's a larger list of acceptable IDs like other states use. It is a DRI procedure, much like that's in place for the people who can't be caught up, but who can't get or don't have one of the larger lists of approved IDs. And that's exactly what... I mean, isn't this equally liberal with other laws that have broader lists of IDs? Because as I understand it, if you fill out that reasonable impediment affidavit, you don't even have to have a picture, right? You might have to have a utility bill or something, but you don't even have to have a photo. So the other IDs are totally irrelevant, aren't they? Well, they're not relevant to the person who's distorted into the other line and has to wait longer than the other may I to whether they can vote, that has to worry about a prosecutor later digging through their affidavit. You voted recently in Texas. I mean, how many other lines are there anymore? Well, now there's two for ID. There's one in the preferred class, and there's one for the back of the bus. Well, maybe somebody needs some empirical study about the two lines. Well, and let me add, that gets to the remand point. And I believe Judge Graves, you asked Ms. Nelson about this in the last exchange there. On the remand point, the question, for example, in U.S. v. Virginia, was you put the position of the plaintiffs back in the position they occupied absent discrimination so far as possible. And, of course, that's a Chief Justice Rehnquist decision at 518 U.S. 515. And so ultimately what the district court had to do here was put the plaintiffs back in its original position. And the only way to do that is to enjoin the original law. And we could have engaged in this debate with the district court as we have here. How would we all as judges and lawyers craft this bill? Let me ask you a question about our case law. A quote from Operation Push. The district court must, a quote, accept the remedy enacted by the state unless remedial legislation itself is shown to violate statutory provisions of the Constitution. That's exactly correct, but it's an effects finding. And that's all it was in Operation Push was an effects finding, not intent. Well, that was a pretty drastic law though there too. Well, I mean, whatever the facts and circumstances are of the law doesn't change the reality that there wasn't an intent finding. That changes the remedy. Well, just take that basic principle. What they're saying is that the legislature has a right to come back to the legislative body of the state and respond, and then the question becomes whether or not that legislative response itself violates the Constitution, et cetera. And I understand you'd be saying that that's not necessarily the truth because we can now drop that into the remedial side, which is much more broadly than whether or not it was freestanding violate the Constitution. Well, I'm not sure if I heard the question, Judge. What I'm suggesting, and I think the Supreme Court cases bear this out. What I'm suggesting to you is that you're arguing that the legislative response here can be enjoined properly by the district court because it's, quote, remedial. And I'm suggesting to you that the tension between that and the principle, whether it's sound or unsound, is that the statutory or legislative response of the legislation must be accepted as a proper remedial response absent of some defect itself. In other words, if that legislative response is constitutional, that's a separate question, then, in fact, you must accept it. Now, that would suggest that you're not without remedy. It's just that you have to challenge the next legislative piece. But what you're contending for is you don't want to do that. I'm not being critical of it. I understand that. But you don't want to go down that road. You want to keep this finding of legislative purpose, in fact, and not have to litigate what you argue here is a violation of the Constitution that's left in there. In other words, what's left in there that you're quarreling with is not necessarily a violation of the law, but you want to remove it. And that's implicit in your argument. And your justification for that is that in a remedial response, you can to findings of discrimination, root and branch, those classic words coming from these halls, to dealing with school desegregation, et cetera. I'm not suggesting they're inept, but I'm suggesting that that's what I hear your argument to be, and I wanted to get your response to that. You can go forward and challenge that. She said purposely, explicitly, that the district court did, but she's not examining the validity of that legislation at all. But she enjoyed it, right? Well, I guess I have three responses to Your Honor's comment. The first is that Senate Bill 5 doesn't cure the effect, so we don't think it's lawful if all we're talking about is effect. But we're not just talking about effect. We're talking about intent, and that's where the standard is different than what Your Honor read from Operation Push. And under intent, you rip out the whole law. In fact, you rip out the whole law even if it doesn't even have a discriminatory intent. And that was decided in the city of Richmond v. U.S. case, which was a redistricting case where the U.S. Supreme Court said, this redistricting plan we found last term to be constitutional in a different jurisdiction. The plan itself is not discriminatory. It was passed without remand from the en banc court and instructed the district court to consider the legislative response. And it also told the district court to not accept any new evidence. And so what the district court did was it considered any remedy response, and it doesn't take any evidence to realize there's still have and have nots on how to do things. You told the district court not to accept any new evidence on S.P.E. 5. Well, it told the district. One reading of the en banc opinion is it told the district court to rely upon the existing record and not accept any new evidence when examining S.P.E. 14 for discriminatory intent. Isn't that what it said? I don't think it's clear, but I accept Your Honor's reading of it. Ultimately, both of the parties said that there's no evidence necessary here. And, of course, from our standpoint, we're reading from U.S. Supreme Court decisions that say it's the state's burden to prove that S.P.E. 5 remedies the intentional finding before. It's the state's burden to put on evidence. That's what this case, this court said in Dillard. And so the state has to prove that S.P.E. 5 is a remedy. And from our standpoint, you can't. There's still have and have nots. There's no money spent to tell the public. You remove the other box. You heighten the criminal penalties. Ultimately, the state, it doesn't matter what evidence you put on, the state can't prove that S.P.E. 5 fully cures and puts voters back in the position they were prior to S.P.E. 14. So, ultimately, what this court, and I know I'm out of time, so I'll just conclude if acceptable to the court. Ultimately, this case is not complicated. I know passions are high. Stakes are high. But the court and this court and the en banc decision decided that there was sufficient evidence of intent. Under the Pullman standard, there's a Rule 52 deference to the district court, and the U.S. Supreme Court says that the correct remedy is to let the legislature fix its intent. The state took 50 yards, and the referees blown the whistle, and the state is asking to only have to give 25 back, and that's not what the law calls for. Well, let me ask you just one other thing by analogy to the redistricting cases. When this court has found that there was an infirmity in creating certain districts, as we did in Bush v. Vera, for instance, the remedy has not been to require the legislature to upend the entire districting of the state of Texas, but to adjust the particular districts that were affected, correct? Well, that's true only if the state has failed to remedy it after being given an opportunity to do so. Absolutely. But what I'm saying here is you say the entire law was passed with discriminatory intent, but in fact your proof was only that a small proportion, even of minority voters relative to the entire universe of them, was disadvantaged. So why doesn't the same principle pertain here? You can look at Green, you can look at those other cases, but minorities were hugely and, you know, globally disadvantaged by the unconstitutional actions there, whereas the proof here is of a subset. Well, for the same reasons that the Ombud Court rejected that argument. That there was a district ID possession, that went to effects, and then there was a separate analysis of intent. But I'm going to the remedy, though, right? I mean, even if there's, quote, intentional discrimination, shouldn't the remedy correlate with the disadvantage suffered by those who were disadvantaged, not by the 90% of minorities who, why should everybody not have a photo voter ID, who can have one, which is something that the Ombud Court said. I understand some people can have that opinion. There's a hundred years, more or less, of U.S. Supreme Court cases that say you don't just try to fix the remedy. You pull out the law root and branch, and you put the people back in the position they would have been before. Okay. For all the reasons I've stated, the opinion below should be affirmed and told. Thank you. Mr. Keller. Judge Negenbachman, you're exactly correct. Operation Bush controls here. And from all three presentations from my friends on the other side, you didn't hear a single record citation of a Texas voter that will face a barrier to voting under the reasonable impediment exceptions the legislature has enacted. And no remand is necessary here because they haven't pleaded any claims against Senate Bill 5. They can bring a new lawsuit against Senate Bill 5. They declined to put in evidence here. They conceded they weren't challenging SB 5 as enacted. That's ROA 69701 and 69703. So they waived any challenge to that. They didn't ask for anything like that in their briefing. That's why a vacater in rendering judgment on this claim is particularly appropriate in this context. On the root and branch point, even in the school desegregation context, what is being pulled out root and branch are the harmful effects.  And in any event, this Court's precedents make clear that school desegregation context precedents are limited to that scenario, and it's hard to extrapolate into other situations such as this one. On the perjury point, first of all, by giving notice on the form that is helpful, I'm willing to bet that if that had not been on the form, the plaintiffs would be saying that there would be some sort of entrapment or some sort of not giving enough notice as to what exactly would be the penalties for something signed on a reasonable impediment declaration. The interim remedy also gave that notice. Regardless, by having that notice on the form, there's no Section 2 effects violation. There's no disparate impact. There's no purpose. They haven't pleaded the claims against SB 5. On the point about the $4 million in voter education, in ROA 69825-27 and ROA 70206-07, this is where the State informed the District Court about those efforts. We are in the process right now of mailing voter registration cards to every single registered voter in the State of Texas, and that gives clear notice as to the state of the law, the reasonable impediment declaration being an option. And this is not going to the back of the line. This is an alternative procedure to mitigate a burden that this Court has found. And I understand the passions are high in this area in this case, but the State Legislature did exactly what this Court said to fix this law. It responded to each of the burdens that are in the record from the plaintiffs that brought this lawsuit. No Texas voter faces a barrier to voting as the law stands today. We preserved our arguments that there was no discriminatory effect, but after SB 5, there is certainly no barrier. The Legislature never had an invidious purpose, but the Court need not reach that because SB 5 cures any potential defect. It is a remedy that must be accepted, and this case should be over. Are there no further questions? No. Thank you. Thank you all very much. Appreciate it.